IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:11-CT-3208-FL

KEITH JAMES SEARS,                          )
                                            )
            Plaintiff,                      )
                                            )
      v.                                    )                    ORDER
                                            )
DEBRA PRICE, BERNARD P.                     )
CONDLIN, SUE GENRICH BERRY,                 )
DEE W. BRAY, ALLISON                        )
STANDARD, BRUCE T.                          )
CUNNINGHAM, JR.; THE                        )
MUNICIPALITY OF CUMBERLAND                  )
COUNTY, THE CITY OF                         )
FAYETTEVILLE, CUMBERLAND                    )
COUNTY JAIL HEALTHCARE,                     )
CUMBERLAND COUNTY JAIL'S                    )
HEALTH AND DENTAL CARE                      )
PROVIDERS, JOHN DOE DOCTOR,                 )
MAJOR J. MCRAINEY, CAPTAIN J.               )
TYNDALL, SERGEANT ADRIENNE                  )
DENISE TAPPS, CUMBERLAND                    )
COUNTY HEALTH DEPARTMENT,                   )
DR. MUHAMMAD WASI HAQ,                      )
ARCHIE MALLOY, DR. RUSSELL                  )
HOLDERNESS, DR. MICHAEL                     )
TENCZA, and NORTH CAROLINA                  )
PRISONER LEGAL SERVICES,                    )
                                            )
            Defendants.                     )

This matter comes before the court on the motion to dismiss pursuant to Federal Rule of Civil

Procedure 12(b)(5) or, in the alternative, for summary judgment pursuant to Federal Rule of Civil

Procedure 56[1] (DE 252) filed by defendants the Cumberland County Health Department, Dr. Muhammad Wasi Haq ("Haq"), Dr. Russell Holderness ("Holderness"), Archie Malloy ("Malloy"), and Dr. Michael Tencza ("Tencza") (collectively the "healthcare defendants"); and the motion for summary judgment (DE 254) filed by defendants the Municipality of Cumberland County, Cumberland County Jail Healthcare, Cumberland County Jail's health and dental care providers, John Doe doctor, John Doe dentist, Major J. McRainey ("McRainey"), Captain J. Tyndall ("Tyndall"), and Sergeant Adrienne Denise Tapps ("Tapps") (collectively the "Cumberland County defendants").[2] Also before the court are plaintiff's motions for summary judgment (DE 262, 272) and motion for reconsideration (DE 290). The issues raised have been fully briefed and are ripe for adjudication. For the following reasons, the court grants defendants' motions for summary judgment, and denies plaintiff's motions.

## STATEMENT OF THE CASE

The court here incorporates the below portion of the background of this case as set forth in its July 9, 2013, order.

---

[1] Because the parties attached materials that are outside of the pleadings, the court construes this motion as a motion for summary judgment.

[2] The Cumberland County defendants move for summary judgment on behalf of the Cumberland County Jail health and dental care providers, John Doe doctor, and John Doe dentist. However, plaintiff amended his complaint and substituted Haq, Holderness, Malloy, and Tencza for the John Doe defendants. See (DE 231.) Accordingly, because the Cumberland County Jail Health and Dental Care providers, John Doe Doctor, and John Doe Dentist have been named, these defendants no longer are parties to this action and are DISMISSED. Additionally, the court notes that Haq, Holderness, Malloy, and Tencza subsequently separately moved for summary judgment (DE 252). Thus, the court will not construe Haq, Holderness, Malloy, or Tencza as joining in the Cumberland County defendants' motion for summary judgment.

2

On March 7, 2011, plaintiff filed this *pro se* action pursuant to 42 U.S.C. § 1983, alleging that his constitutional rights were violated in various ways since his June 21, 2007, arrest on kidnaping and assault charges. The court referred the matter to the magistrate judge to conduct a frivolity review of plaintiff's complaint, and the magistrate judge submitted his memorandum and recommendation ("M&R") on April 18, 2011. Plaintiff subsequently made numerous filings, including three motions to amend his complaint, a motion to appoint counsel, and a motion for a temporary restraining order and for a preliminary injunction.

On May 26, 2011, the court entered an order noting the recommendation of the magistrate judge, but acknowledging plaintiff's numerous subsequent filings. The court then provisionally allowed plaintiff's motions to amend and re-committed the matter to the magistrate judge with direction to renew and revise the original M&R, in light of the amendments . . ..

On June 20, 2011, the magistrate judge issued his renewed M&R, taking into account plaintiff's amendments. On August 9, 2011, the court entered an order in which it overruled plaintiff's objections to the portion of the magistrate judge's order denying his motion to appoint counsel, and adopted in full the findings and recommendations of the magistrate judge. The court granted in part and denied in part plaintiff's motions to amend. The court specifically adopted the following findings by the magistrate judge:

i.      Plaintiff's complaint shall be dismissed in its entirely as to defendants Berry, Bray, Standard, and Cunningham;

ii.     A § 1983 conditions of confinement claim shall be permitted to proceed against Price and Condlin;

iii.    A § 1983 conditions of confinement claim shall be permitted to proceed as against the County and the City;

iv.     The complaint shall not be amended to add Cumberland County Sheriff's Department as a defendant;

v.      The complaint shall be amended to add Cumberland County Jail Healthcare, Cumberland County Jail's Health and Dental Care Providers, John Doe Doctor, and John Doe Dentist as defendants, and allow a § 1983 claim for deliberate

3

indifference under the Eighth Amendment to proceed against them;

vi.    The complaint shall be amended to add McRainey, Tyndall, and Tapps as defendants and allow a § 1983 conditions of confinement claim to proceed against them; and

vii.   Any and all other claims purportedly raised by the complaint(s) shall be dismissed in their entirety.

The court acknowledged that defendants would have a difficult time discerning from the several amendments scattered across the docket exactly what claims plaintiff stated and against whom. Accordingly, the court allowed plaintiff the opportunity to file one amended complaint to state only those claims and defendants that the court permitted to proceed. The court also denied as premature plaintiff's motion requesting the United States Marshals Service to serve summons and complaint.

On September 2, 2011, plaintiff filed his amended complaint in compliance with the court's August 9, 2011, order. Plaintiff subsequently filed a motion for an extension of time to serve his complaint. The City of Fayetteville, Price, Condlin, and the Cumberland County defendants subsequently filed motions to dismiss pursuant to Rules 12(b)(1), (b)(2), and (b)(6), as well as motions for a protective order.[3] These matters were fully briefed.

Plaintiff subsequently filed two motions for discovery, a motion to stay discovery, a motion to strike Condlin's motion to dismiss, and a motion to appoint counsel. Condlin responded to plaintiff's motions. The Cumberland County defendants also filed a second motion for a protective order. Finally, plaintiff filed a motion for this court to rule on his pending motions and a motion to expedite.

On March 16, 2012, the court entered an order granting plaintiff's motion to appoint counsel and appointed North Carolina Prisoner Legal Services ("NCPLS") to represent him. The court also granted the motions for a protective order filed by Condlin, Price, the City of Fayetteville, and the Cumberland County defendants. The court stayed discovery until after NCPLS entered a notice of appearance on behalf of plaintiff, and denied without prejudice plaintiff's motions

---

[3] The City of Fayetteville also filed a second motion for a protective order.

4

for discovery. The court also granted the motions to dismiss filed by Condlin and Price. The court granted the Cumberland County defendants' motion to dismiss as to plaintiff's claims against Cumberland County, but denied it as to the remaining defendants. The court also allowed plaintiff the opportunity to amend his complaint to provide the proper names of the defendants identified as Cumberland County Jail Healthcare, Cumberland County Jail's health and dental care providers, John Doe doctor, and John Doe dentist. Finally, the court converted the City of Fayetteville's motion to dismiss into a motion for summary judgment, directed the Clerk of Court to issue a Rule 56 letter, and allowed the parties to respond.

On March 28, 2012, plaintiff filed a response to this court's March 16, 2012, order, requesting, *inter alia*, an extension of time to respond to the City of Fayetteville's motion for summary judgment. On March 30, 2012, NCPLS attorney April Marie Giancola entered a notice of appearance on behalf of plaintiff. Plaintiff subsequently filed a motion to appoint counsel and a motion to appoint alternative counsel. On May 10, 2012, NCPLS attorney Michele Luecking-Sunman filed a motion for substitution of counsel.

On June 1, 2012, the court entered an order granting NCPLS attorney Michele Lueking-Sunman's motion for substitution of counsel. The court also granted plaintiff's request to respond to the City of Fayetteville's motion for summary judgment and allowed him an additional twenty-one (21) days to respond. The court stated that the City of Fayetteville's motion for summary judgment was held in abeyance until briefing was complete.

On June 5, 2012, plaintiff filed a motion to amend his pending motion for alternative appointment of counsel. NCPLS attorney Michele Luecking-Sunman subsequently filed a motion to withdraw as plaintiff's counsel. Plaintiff then filed a motion to amend his complaint and an ex parte motion for discovery. The City of Fayetteville responded to plaintiff's motion for discovery and motion to amend.

On August 21, 2012, the court entered an order denying as moot the City of Fayetteville's motion to dismiss, granting NCPLS attorney Michele Luecking-Sunman's motion to withdraw, but denying her motion to hold the scheduling order in abeyance. The court also denied plaintiff's "motion to amend [his] pending motion for alternative appointment of counsel," and denied as moot plaintiff's ex parte motion for discovery. Finally, the court granted plaintiff's

5

motion to amend and allowed him twenty-one (21) days to amend his complaint.

Following the court's order, counsel for defendant Bernard Condlin filed a motion to withdraw, which the court allowed. Plaintiff then filed a motion for an extension of time to file his amended pleading, motions to compel discovery, a motion for reconsideration, various motions for appointment of counsel, a motion to voluntarily dismiss the City of Fayetteville, a motion to strike, a motion for an extension of time to complete discovery, a "motion for time extension from notice of the court," a partial motion for summary judgment, a motion for leave to file excess pages, and a motion for a pretrial scheduling order.

In the interim, the Cumberland County defendants filed a motion for a protective order and a motion for summary judgment. The matters were fully briefed.

On July 9, 2013, the court entered an order granting plaintiff's motion to voluntarily dismiss the City of Fayetteville without prejudice. The court, however, denied without prejudice the Cumberland County defendants' motion for a protective order, as well as, denied plaintiff's motions to appoint counsel, his motion to strike the Cumberland County defendants' response to his September 4, 2012, motion to compel, and his motion for the court to reconsider its prior August 21, 2012, denial of his request for counsel. The court granted plaintiff's request for an extension of time to complete discovery. Finally, the court allowed plaintiff's motion to amend his complaint to identify the following previously unknown John Doe parties: Cumberland County Health Department, Haq, Malloy, Holderness (dentist), and Tencza (dentist). The court denied plaintiff's request to add NCPLS as a defendant to assert a First Amendment access to courts claim. The court denied without prejudice the Cumberland County defendants' November 1, 2012, motion for summary judgment without prejudice to allow them to incorporate the newly added defendants.

6

Plaintiff's motion for partial summary judgment also was denied. The court additionally modified its case management order to permit discovery and provided a dispositive motion deadline.

The healthcare defendants subsequently filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(5) arguing that plaintiff failed to properly serve them. Alternatively, the healthcare defendants seek summary judgment on the merits. In support of their motion for summary judgment, the healthcare defendants submitted an affidavit from defendant Haq,[4] which included plaintiff's medical records as an attachment. The healthcare defendants also submitted an affidavit by non-party Captain Daryll J. Morin ("Morin").[5] The Cumberland County defendants also filed a motion for summary judgment, which included supporting affidavits of defendants Haq, Tapps, Tyndall, and non-parties Morin and Wanda Tart.[6] The Cumberland County defendants also submitted supporting evidentiary materials in the form of plaintiff's medical records, detention center water testing results, and other detention center records. Then, plaintiff filed two motions for summary judgment, which included a declaration from plaintiff, as well as documentary evidence. In opposition to plaintiff's motions for summary judgment, the Cumberland County defendants

_____

[4] Haq submitted identical affidavits in support of each of the defendants' respective pending motions for summary judgment (DE 252, 254). For the purposes of this court's order, the court cites the attachments to the respective affidavits as they appear in the healthcare defendants' motion for summary judgment (DE 252).

[5] Cumberland County Sheriff's Office Captain Daryll J. Morin ("Morin") is directly responsible for the administration of the Cumberland County Detention Center. (Morin Aff. ¶ 1.) Morin's affidavit also was submitted in support of both groups of defendants' pending motions for summary judgment (DE 252, 254). As stated, for the purposes of this court's order, the court cites the attachments to the respective affidavits as they appear in the healthcare defendants' motion for summary judgment (DE 252).

[6] Wanda Tart, who employed as the Director of Nursing for the Cumberland County Health Department, submitted an affidavit in support of the Cumberland County defendants' motion for summary judgment. Tart Aff. ¶ 1. Tart is not a party to this action.

7

attached a grievance request, the affidavit of non-party chief jailer Larry J. Trotter ("Trotter"),[7] and the affidavit of non-party field training officer Amanda J. Stephenson. All motions were fully briefed.

Subsequent to the summary judgment briefing, plaintiff filed a motion to compel, motion for reconsideration, motion to freeze defendants' assets, and a motion for pretrial conference. On January 14, 2014, the court denied plaintiff's motions. Finally, on February 5, 2014, plaintiff filed a motion for reconsideration of the court's January 24, 2014, order.

## STATEMENT OF UNDISPUTED FACTS

A.     Facts Regarding Medical Treatment

The undisputed facts may be summarized as follows. On June 21, 2007, plaintiff was arrested and charged with first-degree kidnaping, assault by strangulation, and assault on a female. (Morin Aff. ¶ 12.) Plaintiff, a pretrial detainee, was incarcerated at the Cumberland County Detention Center (the "detention center"). (Id.)

On June 11, 2008, plaintiff was involved in an altercation with two other inmates at the detention center. (Id. ¶ 15.) In the course of the altercation, plaintiff injured his fist when he struck another detainee. (Id.) A nurse examined plaintiff following the altercation and noted that plaintiff's right hand was swollen and that there was an abrasion above his index finger. (Haq Aff. ¶ 15 and Ex. A, p. 11.) The nurse applied ice and made a note to re-evaluate plaintiff's condition. (Id.) Later that day, defendant Haq examined plaintiff and noted that plaintiff had swelling, pain, and discoloration of his right hand, no bony deformity, good range of motion, soft tissue trauma, but a

---

[7] Trotter is the acting chief jailer who replaced defendant McRainey after McRainey was injured in October 2011. Trotter Aff. ¶ 1.

small non-displaced fracture could not be excluded. (Id. Ex. A, p. 18.)  As a result, defendant Haq prescribed Ibuprofen and Ultram (a narcotic pain reliever). (Id. Ex. A, p. 33.)  Due to the swelling in plaintiff's hand, defendant Haq concluded that he needed time to allow plaintiff's swelling to go down to evaluate whether plaintiff's hand was fractured. (Id. and Ex. A, p. 18)  Defendant Haq scheduled a follow-up appointment with plaintiff five days later on June 16, 2008. (Id.)

On June 16, 2008, defendant Haq performed a follow-up examination of plaintiff's hand. (Id. ¶ 16, Ex. A, p. 17.)  Plaintiff's swelling had decreased, and plaintiff denied difficulty moving his fingers. (Id.)  Plaintiff did, however, state that he continued to have pain, especially around the proximal phalanx of the "MP" joint of the finger. (Id.)  Defendant Haq noted that plaintiff looked well and was not in acute pain or distress. (Id.)  Defendant Haq further observed that plaintiff had a resolving hematoma and swelling of the dorsum of the right hand with no visible bony deformity. (Id.)  Defendant Haq further observed that there was palpable tenderness at the MP joint and proximal phalanx of the index finger, with a possible palpable deformity with some decreased range of motion at the MP joint. (Id.)  Based upon these observations, defendant Haq suspected a fracture of plaintiff's MP/proximal phalanx of his index finger and arranged for an electromagnetic radiation test ("x-ray"). (Id.)

Plaintiff had an x-ray of his hand on June 19, 2008, and defendant Haq received the x-ray report the next day. (Id. ¶ 17 and Ex. A, pp. 17, 129.)  The x-ray report reflected a fracture of plaintiff's right hand second metacarpal distally, with the distal second metacarpal head being displaced medially with a degree of foreshortening. (Id.)  Defendant Haq referred plaintiff to an orthopedic specialist. (Id. ¶ 18 and Ex. A, p. 10.)

On June 25, 2008, plaintiff attended an appointment with a physician at Cape Fear Orthopedics, where the physician attempted a reduction of the right second metacarpal fracture without success. (Haq Aff. ¶ 18; (DE 228, Ex. A, p. 10).) The next day, Cape Fear Orthopedics notified Haq that surgery was required for plaintiff and that such surgery was scheduled for June 30, 2008. (Haq Aff. ¶ 19 and Ex. A, p. 10.)

Defendant Haq advised the detention center that plaintiff needed surgery. (Haq Aff. ¶ 20 and Ex. A, pp. 10, 32, 71.) After consulting with the detention center administrators, defendant Haq agreed that there was time to transfer plaintiff to a North Carolina Department of Public Safety ("DPS") hospital so that plaintiff could receive care in a secure environment. (Haq Aff.; Am. Compl. (DE 36, Ex. M, pp. 1-2).) Defendant Haq then immediately contacted Dr. Cornell at Central Prison, and Dr. Cornell agreed to accept plaintiff as a patient. (Haq Aff. Ex. A, p. 9.)

On June 27, 2008, detention center medical staff examined plaintiff and noted that he had a cast on his right forearm, complained of no pain, and that his finger dexterity was good. (Id. ¶ 21 and Ex. A, p. 9.) Plaintiff then was transported to Central Prison. Id. After an initial assessment, plaintiff was transferred from Central Prison to Craven Correctional Institution ("Craven") on July 11, 2008. (Morin Aff. ¶ 21.)

On July 21, 2008, plaintiff was returned to the detention center, and was examined by defendant Haq. (Haq Aff. ¶ 22 and Ex. A, p. 9, 16.) Plaintiff advised defendant Haq that he did not have surgery, and was not seen by an orthopedic surgeon. (Id.) Defendant Haq informed plaintiff that he would arrange for an x-ray of his right hand, provide him with pain medication, and send him to an orthopedic surgeon once the x-ray report was available. (Id.) In response, plaintiff informed

10

defendant Haq that he did not want any treatment from medical staff at the detention center, and refused to sign a release of information.  (Id. Ex A, pp. 16.)

On July 23, 2008, the detention center medical staff office was informed that plaintiff hit his hand against a wall.  (Id. ¶ 23 and Ex. A, pp. 8, 68.)  At approximately 4:35 p.m., a nurse examined plaintiff, and plaintiff advised the nurse that he hit his hand against the wall because he was angry with the treatment that he had discussed with defendant Haq.  (Id.)  Plaintiff later told the nurse that he did not want an x-ray, that he would refuse any treatment at the detention center, and that he would seek treatment when he was released from incarceration.  (Id. ¶ 24 and Ex. A, p. 7.)  The next day, detention center medical staff attempted to have plaintiff sign a release of information so that it could obtain plaintiff's medical records from DPS to determine why plaintiff did not have surgery.  (Id. ¶ 25 and Ex. A, pp. 7, 67.)  Plaintiff refused.  (Id.)

On July 26, 2008, a nurse examined plaintiff in response to plaintiff's complaints of increased pain in his right hand.  (Id. ¶ 26 and Ex. A, p. 7.)  The nurse observed a piece of tape from plaintiff's cast on the floor outside of plaintiff's cell.  (Id.)  Plaintiff stated that he struck his hand against the wall while he was sleeping.  (Id.)  The nurse noted that plaintiff had increased redness and discoloration of his right hand.  (Id.)  The nurse additionally noted that she overheard plaintiff state that if he took the cast apart, he would be seen at an outside hospital.  (Id.)  Defendant Haq instructed detention center staff to contact Craven to get plaintiff's medical records.  (Id. ¶ 27 and Ex. A, p. 6.)  Detention center staff was verbally informed by Craven staff that plaintiff refused care, would not take his medications, and refused to see an orthopedic specialist.[8]  (Id.)

---

[8] The court notes that the Craven medical records could not be provided without a signed release from plaintiff.  (Haq Aff. ¶ 27 and Ex. A, p. 6.)

On July 29, 2008, plaintiff allowed an x-ray to be taken, and the x-ray report indicated that there was a cast in place and that there was a displaced un-united fracture of the distal second metacarpal. (Id. ¶ 28 and Ex. A, p. 128.) Defendant Haq then called Craven and spoke with a physician, Dr. Ingleman, and requested a copy of Dr. Ingleman's note regarding plaintiff's refusal for orthopedic consultation and treatment. (Id. ¶ 29 and Ex. A, p. 6, 169.) Dr. Ingleman faxed the requested note, dated July 15, 2008, to defendant Haq's office on July 31, 2008. (Id. and Ex. A, pp. 254-255.) Dr. Ingleman's note stated the following:

> [Plaintiff] wants to refuse any further care for [right] hand in particular any [surgery] until after release from custody. He claims death threats as his reason for not wanting to proceed. It was explained to him that more delay may increase the chance that future repair could be less successful than if done in the near future. He says he is not going to change his mind. He wants cast removed but did agree to stay in it for one more week as I told him it would likely help in regards to pain compared to no cast. He claims he has been advised to not sign the refusal form regarding orthopedic visit and [surgery] though he clearly states he does not wish to have either done.

(Id. Ex. A, p. 254-255.)

On August 1, 2008, defendant Haq referred plaintiff to Cape Fear Orthopedics and an appointment was scheduled. (Id. ¶ 30 and Ex. A, p. 31.) Plaintiff attended the scheduled appointment and surgery was scheduled for August 13, 2008. (Id. and Ex. A, p. 5.) On August 12, 2008, Plaintiff attended an appointment at Cape Fear Orthopaedics. (Id. and Ex. A, p. 169.) At this appointment, medical staff removed plaintiff's cast and administered an x-ray. (Id.) The x-ray results showed callus formation, so plaintiff's surgery was cancelled. (Id.) As an alternative, medical staff showed plaintiff self-administered exercises and prescribed occupational therapy for his hand. (Id.) Plaintiff submitted grievances on August 13, 2008, complaining that he needed

12

physical therapy.  (Id. ¶ 31 and Ex. A. pp. 62-63.)  Plaintiff subsequently completed ten (10) occupational therapy sessions.  (Id. and Ex. A, pp. 30, 44, and 64; (DE 264, Ex. A-64).)

B.     Facts Pertaining to Dental Treatment

The undisputed facts pertaining to plaintiff's dental treatment may be summarized as follows. On October 25, 2007, plaintiff submitted a sick call request complaining that he "had a gum line filling [] fall out" and was experiencing pain.  (Haq Aff. ¶ 32 and Ex. A, p. 99.)  At some point prior to November 26, 2007, plaintiff was provided an antibiotic.  (Id. and Ex. A, pp. 91, 92.)  Plaintiff submitted a second sick call request on November 19, 2007, again complaining of tooth pain.  (Id. p. 93.)  Plaintiff attended an appointment with medical staff the next day, but did not complain of tooth pain.  (Id. p. 23.)  Plaintiff submitted two additional sick call requests on November 25 and 26.  (Id. and Ex. A, pp. 91, 92).  In response, on November 27, 2007, he was prescribed Advil.  (Id. and p. 37.)

On December 4, 2007, plaintiff submitted a sick call request complaining about tooth pain and stating that the prescribed "pain killer [was] not working."  (Id. p. 90.)  In response, a physician prescribed plaintiff Tylenol.  (Id. p. 36.)  Plaintiff was seen again on December 25, 2007, but refused treatment "due to being charged."  (Id. and pp. 88, 89.)

On January 11, 2008, plaintiff attended an appointment with the dental clinic, and he received fillings.  (Id. ¶ 33 and Ex. A, p. 165.)  On January 21, 2008, plaintiff filed another sick call request complaining that he "had another filling fall out," and that he was "experiencing pain again and would like to get a temporary filling."  (Id. and Ex. A, p. 84.)  Plaintiff was placed on the dental list.  (Id.)

On March 19, 2008, plaintiff submitted a sick call request stating:

> 4 Thursdays ago (1 month today) I was called by block officer Mr.
> Zimmerman and he said that medical called to see if I still needed to
> see the dentist. I responded "yes." He also called Baxley and Blesso
> to see if they still needed dental treatment. On Friday, the very next
> day, everyone went to dental except me. Now, what has happened?
> I have been waiting for dental treatment for a long time, so why
> would medical call to see if I still needed to see dental, but never call
> me to go? Yes, I still need dental treatment . . .

(Haq Aff. Ex. A, p. 79; Am. Compl. (DE 36, Ex. P).) On March 25, 2008, medical staff responded:

"Inmate is on Dental list. Was seen by Dentist on 1-11-08. Inmate is back on Dental list." (Id.) On

March 28, 2008, plaintiff refused dental services. (Id. ¶ 34 and Ex. A, p. 11.)

Plaintiff attended an appointment with defendant Haq in the medical clinic on April 9 and

30, 2008, but did not report any dental or tooth concern. (Id. and Ex. A, pp. 20-21.) Plaintiff

subsequently refused dental services on May 9, 2008. (Id. and Ex. A, p. 11.)

On September 22, 2008, plaintiff submitted a sick call request stating that he had tooth pain

and was requesting pain medications. (Id. and Ex. A, p. 52.) Medical staff responded that plaintiff

already was on pain medication. (Id.) Plaintiff subsequently requested dental treatment on

November 4, 2008, and November 10, 2008. (Id. ¶ 35 and Ex. A, pp. 230, 235.) Plaintiff attended

an appointment with the dentist on November 18, 2008, at which time the dentist noted that plaintiff

was experiencing decay, and that plaintiff wished to save his teeth. (Id. and Ex. A, p. 165.) The

dentist noted an intent to try "temps," to which plaintiff consented. (Id.)

On November 20, 2008, plaintiff submitted a sick call request stating that the filling the

dentist administered on November 19, 2008, was "not working." (Id. ¶ 36, and Ex. A, p. 223.)

Plaintiff submitted an additional sick call request on November 27, 2008. (Id. and Ex. A, p. 218.)

In response, medical staff noted that plaintiff's temporary filling fell out and that there was swelling

at plaintiff's gum line. (Id.) The medical staff further noted that plaintiff stated that the dentist

informed him that the temporary filling may not work.  (Id.)  Medical staff referred plaintiff to the

dental clinic.  (Id.)  Plaintiff saw the dentist on December 10, 2008.  (Id. and Ex. A, p. 165.)

On March 3, 2009, plaintiff submitted a sick call request, stating that he needed a tooth

pulled and mouthwash for gingivitis periodontal disease.  (Id. ¶ 37 and Ex. A, p. 194.)  On March

9, 2009, plaintiff advised medical staff that he did not wish to see the dentist until after his court

date.  (Id.)  Medical staff instructed plaintiff to put in a sick call request after his court date.  (Id.)

On June 2, 2010, plaintiff submitted a sick call request stating that the root of one of his teeth

was exposed.  (Id. ¶ 38 and Ex. A, p. 188.)  In response, medical staff noted that plaintiff had a

broken tooth, a red gum line, facial edema, and that plaintiff complained of pain.  (Id.)  Medical staff

referred plaintiff to defendant Haq and to the dental clinic.  (Id. and Ex. A, pp. 188, 171.)

On June 16, 2010, plaintiff attended an appointment with the dental clinic.  (Id. and Ex. A,

p. 164.)  The dentist noted the following:

> [Patient] reports for pain in area of # 11.  [Patient] states that he
> incurred trauma last week, was hit in the mouth, and area around
> 11/12 was swollen.  PA inconclusive, slight PARL but ([Patient] has
> latex allergy) may be normal variation.  Instructed [patient] to wait
> and see how tooth does before deciding on extraction.  Suspect []
> swelling related to trauma, not tooth infection/abscess.  [Patient]
> understood.  If swelling returns, [patient] will return for ext # 11.
> Also [told patient] that 12 has decay.

(Id.)

On June 21, 2010, plaintiff submitted a sick call request complaining that he "went to the

dentist last week but [the dentist] said [his] tooth did not need to be pulled.  Now the abscess is

getting larger . . . And it hurts. . . ."  (Id. ¶ 39 and Ex. A, p. 186.)  Defendant Haq subsequently

examined plaintiff's mouth and determined that he did not have an abscessed tooth, but that he had

an ulcer on his gum.  (Id.)

15

C.    Facts pertaining to Confinement in Special Management Unit

Finally, the court summarizes the undisputed facts pertaining to plaintiff's confinement in the special management unit at the detention center. The special management unit is used to house inmates for various reasons, including medical reasons, suicide prevention, protective custody, and disciplinary issues. (Morin Aff. ¶ 32.) The special management unit is set up to allow the detention center employees to be able to observe the inmates more closely and to limit their access to or by other inmates. (Id.) The inmates housed in the special management unit are locked in their cells for twenty-three (23) hours per day and are allowed one hour of recreation time every other day. (Id. ¶ 33; Trotter Aff. ¶ 19.) Additionally, the special management cells are cleaned prior to an inmate being placed in the cell. (Trotter Aff. ¶ 20.)

Upon arriving at the detention center, plaintiff initially was assigned to the special management unit for close observation due to the fact that plaintiff's self-inflicted injuries and actions raised concern about the risk of suicide. (Morin Aff. Id. ¶ 13.) After an initial observation period, plaintiff was cleared by medical staff and moved to a general housing unit or pod on June 28, 2007. (Id.; (DE 219, p. 148).)

On October 31, 2007, plaintiff began a fast or hunger strike. (Morin Aff. ¶ 14.) Because of plaintiff's declared hunger strike, detention officers moved plaintiff from the general housing pod for approximately two weeks. (Id. ¶ 14; (DE 219, p. 148).) While in the special management unit, plaintiff was involved in an altercation with another inmate on November 11, 2007, which resulted in plaintiff being ordered to remain in special management for an additional twenty-eight (28) days for disciplinary purposes. (Morin Aff. ¶ 14.) Plaintiff subsequently was transferred to DPS custody on June 27, 2008. ((DE 219, p. 148).)

16

Plaintiff again was placed in the special management unit from July 21, 2008, through July 26, 2008, upon his return from DPS custody. (Morin Aff. ¶ 37.) Plaintiff was returned to general population upon receiving medical clearance. (Id.)

On August 16, 2008, plaintiff complained to a detention officer that he was concerned about threats by another inmate. (Morin Aff. ¶ 38; (DE 256, p. 140-141); (DE 257, p. 91); (DE 219, p. 149).) The detention officer arranged for plaintiff to move to another general housing unit; however, plaintiff refused to enter the new unit stating that he had enemies in that housing unit as well. (Id.) Plaintiff, instead, requested to be transferred to the special management unit. (Id.) Plaintiff then was placed in the special management unit for twenty-eight (28) days for refusing a new housing assignment. (Id.) Then, on September 10, 2008, plaintiff requested to stay in the special management unit until his trial. (Morin Aff. ¶ 38.)

On November 23, 2008, plaintiff was placed in the special management unit because he was engaged in another fast. (Morin Aff. ¶ 39; (DE 256, pp. 56-57).) While in the special management unit, plaintiff complained that he was being threatened by another inmate. (Morin Aff. ¶ 39.) Plaintiff additionally was assigned to the special management unit on the following occasions: (1) January 29, 2009, for being on a hunger strike; (2) February 2, 2009, through February 5, 2009, for observation following a black-out; (3) March 11, 2009, for assaulting another inmate; and (4) March 16, 2009, for approaching a guard and requesting the guard to arrange situations so that plaintiff could assault another inmate. (DE 257, pp. 38, 91, 92-93); Morin Aff. ¶¶ 40).) On March 18, 2009, plaintiff was sentenced in the Cumberland County Superior Court and was transferred to DPS custody. (Morin Aff. ¶ 42.)

On May 17, 2010, plaintiff was returned to the detention center for a court hearing. (Id.) According to detention center policy, an inmate transferred from DPS custody for a hearing must be kept in the "writ pod" of the special management unit until such an inmate is returned to DPS custody. (Id.)

While plaintiff was assigned to the special management unit in May 2008, the water had a "hue or tint to it." (Morin Aff. ¶ 31.) At the request of defendant McRainey, North Carolina Department of Health and Human Services tested the water at the detention center. (Id.; Cumberland County Defendants' Ex. C.) Even though the tests reflected that there were no contaminants, the pipes throughout the special management unit were replaced. Id. Also, medical staff at the detention center prescribed plaintiff bottled drinking water. ((DE 264, p. 43).)

In September 2008, plaintiff filed grievances complaining that he did not have any razor or toothpaste. (Id. p. 47.) In response, detention center staff notified plaintiff that there was a shortage of toothpaste and razors, and that a new supply would arrive shortly. (Id.) Plaintiff received a razor and toothpaste two days after filing his second grievance regarding the issue. (Morin Aff. ¶ 30.)

## DISCUSSION

A.    Plaintiff's Motion for Reconsideration

Plaintiff seeks reconsideration of the court's January 24, 2014, order denying his motion to compel discovery (DE 280), for reconsideration to appoint counsel/motion for access to the court (DE 281), and to freeze assets (DE 288). The court provided a thorough and detailed analysis of the disposition of these motions in its January 24, 2014, order. For the reasons set forth in the court's January 24, 2014, order, plaintiff's motion for reconsideration is DENIED.

B.    Motion to Dismiss

The healthcare defendants assert that they should be dismissed from this action pursuant to Federal Rule of Civil Procedure 12(b)(5) because plaintiff failed to effectuate proper service of process in accordance with Federal Rule of Civil Procedure 4.  Proper service of process (or waiver of service under Fed. R. Civ. P. 4(d)) is necessary for the court to exercise personal jurisdiction over a defendant.  See Murphy Bros., Inc. v. Michetti  Pipe Stringing, Inc., 526 U.S. 344, 350 (1999).  Under Rule 4(m), if service of the summons and complaint is not made upon a defendant within one hundred twenty (120) days after the filing of the complaint, the court must dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time, unless the plaintiff can show good cause.  Fed. R. Civ. P. 4(m).

Rule 4(e)(1) permits a plaintiff to serve individual defendants pursuant to the law of the "state in which the district court is located."  Fed. R. Civ. P. 4(e)(1).  The North Carolina Rules of Civil Procedure permit service "[b]y mailing a copy of the summons and of the complaint, registered or certified mail, return receipt requested, addressed to the party to be served, and delivering to the addressee."  N.C. Gen. Stat. § 1A-1, Rule  4(j)(1)(c).   A plaintiff may deliver the documents to defendant's place of employment.  See id.; Moore v. Cox, 341 F. Supp. 2d 570, 573 (M.D.N.C. 2004).

When a defendant challenges service by certified mail, a plaintiff must submit an affidavit stating that a copy of the summons and complaint was mailed and attach the return receipt indicating that service was received in accordance with N.C. Gen. Stat. § 1-75.10(a)(4).  See Moore, 341 F. Supp. 2d. at 573.  If the attached return receipt was signed by a person other than the addressee, North Carolina presumes "that the person who received the mail . . . and signed the receipt was an

19

agent of the addressee authorized by appointment or by law to be served or to accept service of process." N.C. Gen. Stat. § 1A-1, Rule 4(j2)(2); see Moore, 341 F. Supp. 2d. at 573; see also Fender v. Deaton, 130 N.C. App. 657, 662 (1998), rev. denied by 350 N.C. 94 (1999). A party may rebut this presumption of valid service with "affidavits of more than one person showing unequivocally that proper service was not made upon the person of the defendant." Grimsley v. Nelson, 342 N.C. 542, 545 (1996); see Moore, 341 F. Supp. 2d at 573.

In this case, the United States Marshal filed a return of service on the healthcare defendants indicating service on them at their place of employment via certified mail, return receipt requested. The healthcare defendants have not presented the "affidavits of more than one person," challenging service. Grimsley, 342 N.C. at 545, 467 S.E.2d at 94; see Moore, 341 F. Supp. 2d at 573. Because the healthcare defendants have not overcome the presumption of valid service under North Carolina law, the court DENIES their motion to dismiss without prejudice to the extent that it is based on improper service. The court now turns to defendants' respective motions for summary judgment.

C.      Defendants' Motions for Summary Judgment

     1.      Standard of Review

Summary judgment is appropriate when there exists no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the burden of initially coming forward and demonstrating an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact requiring trial. Matsushita Elec. Industrial Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587

(1986).  There is no issue for trial unless there is sufficient evidence favoring the non-moving party

for a jury to return a verdict for that party.  Anderson, 477 U.S. at 250.

2.      Analysis

Defendants raise the defense of qualified immunity against plaintiff's § 1983 action.

Government officials are entitled to qualified immunity from civil damages so long as "their conduct

does not violate clearly established statutory or constitutional rights of which a reasonable person

would have known."      Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  In other words, a

government official is entitled to qualified immunity when (1) the plaintiff has not demonstrated a

violation of a constitutional right, or (2) the court concludes that the right at issue was not clearly

established at the time of the official's alleged misconduct.  Pearson v. Callahan, 555 U.S. 223, 236

(2009).  The court now determines whether plaintiff is able to establish a constitutional violation

with respect to each of his claims.

a.      Conditions of Confinement

Plaintiff asserts defendants McRainey, Tyndall, and Tapps acted with deliberate indifference

to his conditions of confinement in violation of the Fourteenth Amendment.[9]  "In order to make out

a *prima facie* case that prison conditions violate the Eighth Amendment, a plaintiff must show both

'(1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions

---

[9] Plaintiff was a pretrial detainee at the time he filed this action.  Confinement conditions
of pretrial detainees are to be evaluated under the Due Process Clause of the Fourteenth
Amendment, rather than under the Eighth Amendment of the United States Constitution.  Bell v.
Wolfish, 441 U.S. 520, 535 n.16 (1979).  However, as a practical matter, the contours of the Due
Process Clause are coextensive with the substantive constitutional principles applied by the
Eighth Amendment to convicted inmates.  See Riley v. Dorton, 115 F.3d 1159, 1166-67 (4th Cir.
1997), abrogated on other grounds by, Wilkins v. Gaddy, 559 us 34 (2010); Hill v. Nicodemus,
979 F.2d 987, 991-92 (4th Cir. 1992).  Accordingly, plaintiff's Fourteenth Amendment Due
Process claims will be analyzed under the Eighth Amendment.

on the part of prison officials.' " Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993) (quoting

Williams v. Griffin, 952 F.2d 820, 824 (4th Cir. 1991)). The first prong is an objective one – the

prisoner must show that "the deprivation of [a] basic human need was *objectively* sufficiently

serious" – and the second prong is subjective – the prisoner must show that "*subjectively* the

officials act[ed] with a sufficiently culpable state of mind." Strickler, 989 F.2d at 1379 (internal

quotations omitted). Only extreme deprivations are adequate to satisfy the objective component of

an Eighth Amendment claim regarding conditions of confinement. See Hudson v. McMillian, 503

U.S. 1, 9 (1992). In order to demonstrate such an extreme deprivation, a prisoner "must produce

evidence of a serious or significant physical or emotional injury resulting from the challenged

conditions," Strickler, 989 F.2d at 1381, or demonstrate a substantial risk of such serious harm

resulting from the prisoner's unwilling exposure to the challenged conditions. See Helling v.

McKinney, 509 U.S. 25, 33-35 (1993).

Plaintiff asserts that he was housed in the special management unit for a period of time

exceeding one year which was cruel and unusual punishment in violation of his constitutional rights.

The Fourth Circuit has held that the "length of time [in isolated segregation] is simply one

consideration among many in the Eighth Amendment inquiry" and that "the indefinite duration of

[an] inmate's segregation does not render it unconstitutional." In re Long Term Admin. Segregation

of Inmates Designated as Five Percenters ("Five Percenters"), 174 F.3d 464, 472 (4th Cir. 1999)

(citation and quotation omitted) (finding no Eighth Amendment violation where inmates were

confined in maximum custody for over three years and did not expect to be released in the

foreseeable future). Where, as in this case, the inmate requests to be housed in segregation,[10] such conditions do not constitute cruel and unusual punishment. See Breeden v. Jackson, 457 F.2d 578, 579-580 (4th Cir. 1972).

The record also reflects that plaintiff was housed on the special management unit for suicide watch, for hunger strikes, and for disciplinary purposes. At other times, plaintiff was housed in the special management unit because he posed a threat to the maintenance of order in the institution, because he required medical observation, and because of his transfer into or out of the facility on a writ or safekeeping order. Id. ¶ 14, 36, 37, 38. These reasons for placing plaintiff in segregation are reasonably related to legitimate penological interests of inmate and institutional security as well as for plaintiff's own personal health and safety. See Sandin v. Conner, 515 U.S. 472, 482-83 (1995); Five Percenters, 174 F.3d at 469 ("Prison officials should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security .") Accordingly, the duration of plaintiff's confinement in the special management unit alone does not violate the Eighth or Fourteenth Amendments. The court now examines the remaining alleged unconstitutional conditions of confinement to determine whether the conditions in the special management unit violated his constitutional rights.

Plaintiff complains that he was denied basic necessities, specifically razors and toothpaste, while in the special management unit. Conditions which "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment. Rhodes v. Chapman,

_____

[10] The record reflects that plaintiff requested to be housed in the special management unit on August 16, 2008, due to threats from other detainees, and that he requested to remain in that unit until his trial. (Morin Aff. ¶ 38.)

23

452 U.S. 337, 347 (1981). However, conditions that are merely restrictive or even harsh "are part of the penalty that criminal offenders pay for their offenses against society." Id.

On September 2, 2008, plaintiff complained to prison officials about the shortage of razors and toothpaste, and at that time, the detention center was in fact experiencing a shortage of such items. The items subsequently were provided to plaintiff by September 25, 2008. (Morin Aff. ¶ 30.) A temporary deprivation of hygiene items where plaintiff has not alleged any harm is insufficient to establish a constitutional violation. See Rhodes, 452 U.S. at 347; see e.g. Lore v. Wilkes, No. 1:12CV165, 2013 WL 5935072, at *6-7 (M.D.N.C. Nov. 1, 2013) (stating that allegations that plaintiff was "denied personal grooming materials required to be provided to the prisoners" fail to state a claim, "particularly given the complaint's lack of factual matter indicating that he suffered any harm"); Woods v. United States, No. 7:10CV00420, 2012 WL 1005010, at *11 (W.D.Va. Mar. 22, 2012) (finding no violation where prisoner alleged that he was deprived of toothbrush, toothpaste, and soap for a maximum of seven days); Eakle v. Grover Rosencrance, No. 2:09cv105, 2009 WL 6057260, at *3 (N.D.W.Va. Dec. 4, 2009) (dismissing for failure to state a claim where prisoner alleged that he was denied soap, shampoo, deodorant, and toothpaste, among other conditions); see also Harris v. Fleming, 839 F.2d 1232, 1234-35 (7th Cir. 1988) (affirming rejection of constitutional claim for denial of basic human needs despite the fact that the plaintiff "was not provided with toilet paper for five days . . . and that he lacked soap, toothbrush, and toothpaste for ten (10) days," because "[a]lthough [he] experienced considerable unpleasantness, he suffered no physical harm").

Plaintiff also contends that the conditions in the special management unit violated his constitutional rights because he was required to lay on a pallet surrounded by feces[11] and urine covered walls. Plaintiff further alleges that he was denied sufficient amounts of food, that detention officers spit on his food, and that he was denied clean linen. Plaintiff, however, has not provided sufficient factual support for these claims, including any specific dates, times, or identifying information for defendants. See Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir. 1996); White v. White, 886 F.2d 721, 723 (4th Cir. 1989) (dismissing complaint where it "failed to contain any factual allegations tending to support [plaintiff's] bare assertion . . . ."). Further, plaintiff's claims are belied by the record. Specifically, the detention center's chief jailer, Larry J. Trotter, attested in an affidavit that the special management cells are kept clean. (Trotter Aff. ¶ 20.) The fact that plaintiff requested placement in the special management unit supports this. ((DE 257, p. 19).) Based upon the foregoing, the court finds that plaintiff cannot establish a constitutional violation because he has not established that defendants McRainey, Tyndall, or Tapps actually knew of and disregarded the alleged unsanitary conditions.

The court considers next plaintiff's allegation that his prison conditions violated his constitutional rights because he was denied outdoor exercise. Generally, restrictions on outdoor exercise do not violate the due process clause where detainees are permitted indoor exercise. See Jones v. Kelly, No. 89-6651, 1990 WL 33936, at *1 (4th Cir. March 8, 1990) ("It is well settled that

_____

[11] Plaintiff additionally fails to provide sufficient factual support for his contention that guards at the detention center paid other inmates to throw feces at him. Nor is there any evidence to support plaintiff's contention that a staphylococcus aureus infection plaintiff had was the result of an unsanitary cell. Thus, plaintiff failed to establish a constitutional violation. See White v. White, 886 F.2d 721, 723 (4th Cir. 1989) (dismissing complaint where it "failed to contain any factual allegations tending to support [plaintiff's] bare assertion . . . .")

jails may provide space for indoor exercise and recreation as an alternative to outdoor recreational facilities, absent medical evidence demonstrating a need for outdoor exercise."); <u>Coil v. Peterkin</u>, No. 1:07cv145, 2009 WL 3247848, at *12 (M.D.N.C Oct. 5, 2009) ("[W]ith regard to Plaintiff's outdoor exercise claim, [t]his is not the kind of extraordinary case of palpable deprivation of the minimal requirements of civilized existence in which an inference of serious injury might be reasonable."), <u>aff'd</u> 401 F. App'x 773 (4th Cir. 2010).

Here, the record reflects that plaintiff was permitted one hour of indoor recreation every other day. (Morin Aff. ¶ 33.) The record further reflects that, on at least some occasions, plaintiff refused to participate in recreation. (Tapps Aff. ¶ 34.) Because plaintiff was allowed regular indoor exercise opportunity, he failed to establish a constitutional violation.

Finally, the court addresses plaintiff's contention that his prison conditions constituted cruel and unusual punishment because he did not have clean drinking water while housed in the special management unit. Beginning with the objective prong of the Eighth Amendment test, defendants admit that the water in the special management unit had a hue or tint to it while plaintiff was incarcerated there. However, there is no evidence that the alleged unclean drinking water caused plaintiff any injury.

As for the subjective prong of the test, the record reflects that the water was tested in response to plaintiff's complaints, but that each tested sample was found to be free from contaminants. (Morin Aff. ¶ 31 and Cumberland County Defendants' Ex. C.) Further, even though the samples reflected no contaminants, the pipes throughout the special management unit were replaced. (Morin Aff. ¶ 31.) Moreover, plaintiff was offered bottled drinking water as a precaution. Based upon the foregoing, the evidence in the record reflects that defendants did not act with

deliberate indifference to the water quality at the time plaintiff was housed in the special management unit.

Based upon the foregoing, the court finds that none of the alleged prison conditions violated his constitutional rights. See, e.g., Beverati v. Smith, 120 F.3d 500, 504 (4th Cir. 1997) (holding that administrative confinement in cells "infested with vermin . . . smeared with human feces and urine . . . flooded with water from a leak in the toilet . . . [and] unbearably hot . . . were not so atypical that exposure to them for six months imposed a significant hardship in relation to the ordinary incidents of prison life"). Because plaintiff has not established a constitutional violation, defendants' are entitled to qualified immunity for these claims.

      b.     Deliberate Indifference to Medical and Dental Needs

      1.     Medical Needs

The court begins with plaintiff's Fourteenth Amendment claim that defendant Haq acted with deliberate indifference to his serious medical needs. The court assumes, without deciding, that plaintiff is able to satisfy the objective prong of the two-prong test set forth in Strickler v. Waters, 989 F.2d 1375 (4th Cir. 1993), as set forth above. Accordingly, the court focuses its inquiry on the second prong-whether defendants acted with deliberate indifference to his serious medical needs. "Deliberate indifference entails something more than mere negligence, . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." See Farmer v. Brennan, 511 U.S. 825, 835 (1994). It requires that a prison official actually know of and disregard an objectively serious condition, medical need, or risk of harm. Id. at 837; Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995). Mere negligence or

malpractice in diagnosis or treatment does not state a constitutional claim. Estelle v. Gamble, 429 U.S. 97, 105-106 (1976); Johnson v. Quinones, 145 F.3d 164, 168 (4th Cir. 1998).

To the extent plaintiff alleges that medical staff, including defendant Haq, failed to treat plaintiff's June 11, 2008, hand injury, the record belies plaintiff's assertion. The record reflects that both a nurse and defendant Haq examined plaintiff on the date of his injury and provided ice, Ibuprofen, and narcotic pain reliever. (Haq Aff. ¶ 15.) Plaintiff again was examined by defendant Haq on June 16, 2008, and defendant Haq ordered an x-ray for plaintiff which occurred on June 19, 2008. (Id. ¶ 16-17.) Once defendant Haq determined that plaintiff's hand was broken, he referred plaintiff to an orthopedic specialist, and plaintiff was transferred to DPS custody so that he could receive the necessary care. Upon plaintiff's return from DPS custody, defendant Haq resumed treating plaintiff's hand injury and provided plaintiff continuous treatment, including physical therapy, for his hand. Based upon the foregoing, the record reflects that defendant Haq and the detention center medical staff provided plaintiff with continuous medical treatment while he was incarcerated at the detention center.

To the extent plaintiff contends that the eight day delay in scheduling an x-ray for plaintiff's hand violated plaintiff's constitutional rights, plaintiff's claim is meritless. As stated, defendant Haq monitored plaintiff's injury from its inception. The record reflects that defendant Haq waited to schedule plaintiff for an x-ray to allow the swelling in his hand to decrease, which is a matter of medical judgment. Any mistakes of medical judgment are not actionable pursuant to § 1983. See Estelle, 429 U.S. at 107 ("[T]he question of whether an x-ray-or additional diagnostic techniques or forms of treatment--is indicated is a classic example of a matter for medical judgment. A medical decision not to order an x-ray, or like measures, does not represent cruel and unusual punishment.

At most it is medical malpractice . . . ."); Russell v. Sheffer, 528 F.2d 318, 319 (4th Cir. 1975); see also, Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985) (citation omitted) ("Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged."); Cowles v. Kulpinski, No. 1:10cv836, 2011 WL 586919, at *4 (E.D. Va. Feb. 8, 2011) (finding no constitutional violation where plaintiff received medical attention including an x-ray of his hand within a week), aff'd, 430 F. App'x 239 (4th Cir. 2011). Nor does any negligence in connection with Haq's decision give rise to a constitutional violation. See Grayson, 195 F.3d at 695.

The court now turns to plaintiff's contention that his constitutional rights were violated because defendant Haq delayed scheduling his surgery until after the point where surgery no longer was an option. The record, again, belies plaintiff's contention. The record, instead, indicates that once plaintiff was returned to the detention center from DPS custody on July 21, 2008, defendant Haq made several attempts to obtain plaintiff's medical records from DPS, despite plaintiff's refusal to sign an authorization for defendant Haq to obtain the records. Defendant Haq eventually obtained a medical note from DPS indicating plaintiff's refusal of treatment. Although plaintiff continued to refuse surgery at the detention center, defendant Haq continued to treat plaintiff for his injuries and ultimately was successful in getting plaintiff's consent for surgery. However, at that point, surgery no longer was a possibility. Defendant Haq's efforts in connection with the treatment of plaintiff's hand are well documented in plaintiff's medical records, and plaintiff has not provided any evidence to support a contrary finding, aside from his unsupported statement that he did not refuse treatment. Moreover, in determining whether a prison official is deliberately indifferent to a prisoner's serious medical needs, the court generally may rely on medical records concerning

examination and treatment of the inmate.  See Bennett v. Reed, 534 F. Supp. 83, 87 (E.D.N.C. 1981), aff'd, 676 F.2d 690 (4th Cir. 1982); see also, Dulany v. Carnahan, 132 F.3d 1234, 1240 (8th Cir. 1997) ("In the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that she did not feel she received adequate treatment.").

Additionally, although plaintiff asserts that the efforts of defendant Haq and the detention center medical staff in treating his medical needs were not effective, the fact that their treatment of him was not effective does not give rise to a constitutional violation.[12]  See e.g., Russell, 528 F.2d at 319; see also Johnson, 145 F.3d at 167 (finding that negligent acts are not sufficient to establish a constitutional violation); Starling v. United States, 664 F. Supp. 2d 558, 569-70 (D.S.C. 2009) ("The mere fact that a prisoner may believe he had a more serious injury or that he required better treatment does not establish a constitutional violation.").  Therefore, plaintiff has not established the subjective element of his Eighth Amendment deliberate indifference claim, and there is no constitutional violation.  Based upon the foregoing, defendant Haq is entitled to qualified immunity for this claim.

The court now turns to plaintiff's Fourteenth Amendment claim that correctional officers defendant McRainey, defendant Tyndall, and defendant Tapps acted with deliberate indifference to

---

[12]  The court notes that plaintiff states that the medical staff acted with deliberate indifference to his medical needs because they prescribed him Tylenol, despite the fact that he was not permitted to have Tylenol due to a liver condition.  However, there is no evidence in the record to reflect that plaintiff had a liver condition that prevented him from taking Tylenol or that he reported such condition to medical staff.  Nor is there any evidence that plaintiff suffered any significant injury as a result of taking Tylenol.  Finally, the record reflects that plaintiff stopped taking Tylenol at one point because it upset his stomach, but that at a later point, he reported that taking Tylenol "cut down on shooting pains."  (Haq Aff. ¶ 32 and Ex. A, pp. 66, 205.)

his medical care. In particular, plaintiff states that he complained to these defendants about hand-pain after his injury, and that the officers advised him to put in a sick call request. Plaintiff additionally alleges that these defendants left him in his cell for fourteen (14) days without any medical treatment except Tylenol. (DE 219, p. 7.)

A prison guard acts with deliberate indifference to a serious medical need by intentionally denying or delaying access to medical care or intentionally interfering with prescribed treatment. Estelle, 429 U.S. at 104-05; Watson v. Brown, 446 F. App'x 643, 645 (4th Cir. 2011). Here, the record reflects that plaintiff received medical care, including Ultram, a narcotic pain reliever, immediately following his hand injury. (Haq Aff. ¶ 15 and Ex. A, p. 18, 33.) As non-medical providers, defendant McRainey, defendant Tyndall, and defendant Tapps were justified in relying on the judgment of defendant Haq, plaintiff's treating physician, with regard to the course of treatment necessary for plaintiff. Miltier v. Beorn, 896 F.2d 848, 854 (4th Cir. 1990), overruled in part on other grounds by, Farmer v. Brennan, 511 U.S. 825 (1994); Smith v. Berry, 985 F.2d 180, 184 (4th Cir. 1993) (affirming directed verdict for prison guards not in a position to "act meaningfully" with regard to inmate's medical needs); see also Mason v. Angelone, No. Civ. A.7:01-CV-309, 2003 WL 23312780, at *4 (W.D. Va. Mar. 31, 2003) ("[A] medical treatment claim cannot be brought against non-medical personnel unless they were personally involved with a denial of treatment, deliberately interfered with prison doctors' treatment, or tacitly authorized or were indifferent to the prison physicians' misconduct.") (citations omitted), aff'd, 71 F. App'x 283 (4th Cir. 2003). There is no indication that the detention officers interfered with the prescribed course

of treatment or acted with deliberate indifference to plaintiff's medical needs.[13] Further, there is no indication that plaintiff was suffering from acute pain while waiting for his follow-up appointment. Rather, the record reflects that defendant Haq noted, at plaintiff's five-day follow-up appointment, that plaintiff looked well and was not in acute pain or distress. (Haq Aff. ¶ 16, Ex. A, p. 17.) Thus, plaintiff fails to satisfy the subjective prong of the Eighth/Fourteenth Amendment test in connection with this claim. Based upon the foregoing, defendant McRainey, defendant Tyndall, and defendant Tapps are entitled to qualified immunity for this claim.

      2.    Dental Needs

Plaintiff alleges that defendant Haq, defendant Holderness, and defendant Tencza acted with deliberate indifference to his dental needs. Particularly, plaintiff asserts that he filed a sick call request on October 25, 2007, and a grievance on December 28, 2007, stating that he had a broken tooth and was not being provided medical treatment. (Haq Aff. ¶ 32 and Ex. A. pp. 88, 93.) Plaintiff, additionally, submitted a dental services request on January 21, 2010, complaining of an abscessed tooth. (Id. ¶ 39, and Ex. A, p. 186.) In addition to these complaints, plaintiff submitted several additional requests for dental treatment.

The record reflects that plaintiff was provided pain medication and an antibiotic in response to his October 25, 2007, sick call request. (Haq Aff. ¶ 32, Ex. A, p. 91.) Additionally, plaintiff, was referred to the dental clinic following his December 28, 2007, grievance, and was provided treatment

---

[13] Plaintiff makes the conclusory assertion that he refused to have surgery due to correctional officers' threats that if he had surgery, he would be attacked. There is no evidence in the record to support such a finding. Plaintiff's conclusory allegations are insufficient to state a constitutional claim. See Cochran, 73 F.3d at 1317; White, 886 F.2d at 723 (dismissing complaint where it "failed to contain any factual allegations tending to support [plaintiff's] bare assertion . . . .")

including fillings on January 21, 2008. (Id. ¶ 33 and Attach. A, p. 165). In response to his January 21, 2010, complaints of an abscessed tooth, defendant Haq examined plaintiff and found that plaintiff did not have an abscessed tooth, but that he had an ulcer on his gum. (Id. ¶ 39 and Ex. A, p. 186.) In addition to these specific instances of dental care, plaintiff was seen by the dental clinic on December 10, 2008, and June 16, 2010. (Id. ¶¶ 36, 38 and Attach. A, pp. 165, 186.) The record further reflects that plaintiff refused to attend dental-related appointments on several occasions, including December 25, 2007, March 28, 2008, and May 9, 2008. (Id. ¶ 32, 34 and Ex. A, pp. 11, 89.) Plaintiff, on March 9, 2009, advised medical staff that he did not want to see the dentist until after court. (Id. ¶ 37 and Ex. A, p. 194.) Based upon the foregoing, the court finds that defendant Haq, defendant Holderness, and defendant Tencza were responsive to plaintiff's dental related-complaints. Plaintiff has not presented any evidence to the contrary.

To the extent plaintiff disagrees with the assessment that his dental condition was not an emergency or an abscess, such disagreement fails to state a constitutional claim. See e.g., Russell, 528 F.2d at 319; King v. United States, 536 F. App'x 358, 361-362 (4th Cir. 2013) (finding that dental staff's failure to take common sense steps before performing dental work on prisoner did not rise to the level of deliberate indifference); Tozzi v. N.C. Dep't of Corrs., No. 87-7383, 1988 WL 46310, at *1 (4th Cir. May 12, 1988) (finding no deliberate indifference where defendant dentists treated plaintiff's periodontal disease with desensitizing agents); Wilson v. Coleman, No. 7:09CV00325, 2009 WL 3055268, at *5 (W.D.Va. Sept. 24, 2009) (holding no deliberate indifference existed where, in the opinion of a medical professional, plaintiff did not require emergent dental care for deteriorated fillings and bleeding gums), aff'd, 395 F. App'x 41 (4th Cir. 2010). Nor is any alleged negligence sufficient to state a constitutional violation. See King v.

United States, 536 F. App'x 358, 362 (4th Cir.2013) (observing that "the Constitution's protection of rights does not provide a remedy for mere errors in judgment, even though such errors may have unfortunate consequences") (internal quotations omitted); Webb v. Hamidullah, 281 F. App'x 159, 166 (4th Cir. 2008) ("negligent medical diagnosis or treatment, without more, do not constitute deliberate indifference"); Williams v. Bartee, No. CCB-10-935, 2011 WL 2842367, at *4 (D. Md. July 14, 2011) (finding no constitutional violation where two-and-a-half month delay in dental treatment did not result in serious consequence to plaintiff's overall dental health and that "a certain amount of delay in providing appointments for dental care in a large pre-trial detention center are not unexpected"), aff'd, 469 F. App'x 270 (4th Cir. 2012). Finally, plaintiff has presented no evidence reflecting that defendant Haq, defendant Holderness, or defendant Tencza acted with deliberate indifference to his dental needs. As a result, the court finds that plaintiff is unable to satisfy the subjective prong of the Eighth/Fourteenth Amendment test, and defendant Haq, defendant Holderness, and defendant Tencza are entitled to qualified immunity for this claim.

In relation to both his medical and dental-related claims, plaintiff repeatedly asserts that the detention center failed to follow its own policy with respect to plaintiff's treatment for both his broken hand and his dental condition. However, even when a policy is not followed, it does not necessary mean there is a constitutional violation. See Smith v. Atkins, 777 F. Supp. 2d 955, 965 (E.D.N.C. 2011) (stating "the mere failure to comply with . . . [a] state regulation and jail policy [regarding suicide watches] is not a constitutional violation."). Here, assuming plaintiff is correct and detention staff violated its own policies, as stated, the record reflects that medical staff provided plaintiff with continuous care for his medical and dental needs, and there is no constitutional violation.

c.      Supervisor Liability Claim

Plaintiff alleges that defendant Malloy, the detention center's health administrator, acted with deliberate indifference to his medical and dental needs.  Plaintiff, however, claims no involvement by defendant Malloy in his actual medical or dental treatment.  Rather, plaintiff asserts that he complained to defendant Malloy, and that defendant Malloy did not provide him with adequate emergency treatment.  Based upon these allegations, it appears that plaintiff is attempting to hold defendant Malloy liable in defendant Malloy's capacity as a supervisor.

Supervisors in a § 1983 action may not be held liable based upon a theory of *respondeat superior.*  Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009); Monell v. Dep't of Social Services, 436 U.S. 658, 694 (1978).  Instead, "liability ultimately is determined 'by pinpointing the persons in the decision making chain whose deliberate indifference permitted the constitutional abuses to continue unchecked.' "  Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994) (quoting Slakan v. Porter, 737 F.2d 368, 372-73 (4th Cir. 1984)).  To establish supervisor liability under § 1983, a plaintiff must establish:

> (1)      that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff;
>
> (2)      that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices"; and
>
> (3)      that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

Shaw, 13 F.3d at 799.

Here, the evidence in the record reflects that plaintiff filed complaints and grievances related to his medical care and that staff thoroughly reviewed and responded to plaintiff's complaints. The record further reflects that plaintiff was provided with continuous medical and dental care. As was done in this case, prison officials are entitled to rely on medical judgments and expertise of prison physicians and medical personnel concerning the course of treatment deemed necessary for prisoners. See Shakka, 71 F.3d at 167 (citing Miltier, 896 F.2d at 854); Meloy v. Bachmeier, 302 F.3d 845, 849 (8th Cir. 2002) ("Prison officials cannot substitute their judgment for a medical professional's prescription."). Thus, because plaintiff has not presented evidence sufficient to establish supervisor liability, defendant Malloy's motion for summary judgment will be granted.[14]

d.      Municipality of Cumberland County

As for plaintiff's claim against the municipality of Cumberland County, liability attaches to local government units only if conduct directly causing the alleged deprivation is undertaken to effectuate official policy or custom. Monell, 436 U.S. at 694. A policy or custom for which a municipality may be held liable can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifests deliberate indifference to the rights of citizens; or (4) through a practice that is so "persistent and widespread" as to constitute a custom or usage with the force of law. Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003) (citations and quotations omitted). Based upon the foregoing, in order to survive summary judgment, plaintiff must forecast evidence that employees of the municipality of

---

[14] To the extent plaintiff alleges supervisor liability claims against defendants McRainey or Tyndall, for the same reasons set forth above, the court finds that plaintiff failed to establish a supervisor liability claim against these defendants.

Cumberland County were recklessly indifferent to plaintiff's constitutional rights and that such reckless indifference arose from an official policy or custom of the Sheriff's Department. See Breen v. Pendergraph, No. 3:05cv148, 2007 WL 4591868, *7 (W.D.N.C. Dec. 28, 2007). As set forth above, plaintiff failed to establish a constitutional violation as to any defendant. Moreover, plaintiff failed to establish that any official policy or custom violate his constitutional rights. Thus, the municipality of Cumberland County's motion for summary judgment will be granted.

      e.      Cumberland County Health Department and Cumberland County Healthcare

Plaintiff brought this action against the Cumberland County Health Department and Cumberland County healthcare. Claims filed pursuant to § 1983 must be directed at persons. See Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989); Preval v. Reno, No. 99-6950, 2000 WL 20591, *1 (4th Cir. Jan. 13, 2000). Because the Cumberland County Health Department and Cumberland County healthcare are not persons, they are not proper parties to a § 1983 action. Therefore, the court will grant the motion for summary judgment as to the Cumberland County Health Department and Cumberland County healthcare.

      f.      Conspiracy

To the extent plaintiff alleges that defendants conspired to violate his constitutional rights, plaintiff has provided no evidence to support such a claim. Instead, plaintiff relies upon the conclusory allegations of conspiracy set forth in his pleadings, which are not sufficient to state a conspiracy claim. See Wiggins v. 11Kew Garden Court, No. 12-1424, 2012 WL 3668019, at * 2 (4th Cir. Aug. 28, 2012) ("To properly plead an unconstitutional conspiracy, a plaintiff must assert facts from which a conspiratorial agreement can be inferred."); Miller v. DeMarino, No. 1:01CV183, 2002 WL 32096597, at *1 (N.D.W. Va. Apr. 24, 2002) (finding that naked assertions of a conspiracy

are not sufficient to support an action pursuant to 42 U.S.C. § 1983), aff'd, 45 F. App'x 292 (4th Cir. Sep. 10, 2002). Thus, the court will grant defendants' motion for summary judgment for this claim.

g.      Injunctive Relief

The court now addresses plaintiff's request for injunctive relief. Because the court determined that plaintiff has not established a constitutional violation, his claims for injunctive relief are DENIED. See Bennett v. Reed, 534 F. Supp. 83, 86 (E.D.N.C. 1981) ("Injunctive relief may be granted only upon plaintiff's proof of constitutional violations."), aff'd, 676 F.2d 690 (4th Cir. 1982).

h.      New Allegations

Plaintiff repeatedly attempts to assert allegations regarding an assault, deprivation of property, and deprivation of clothing which he asserts occurred while he was in DPS custody. Such claims do not involve the defendants in this action. Moreover, plaintiff currently is litigating these claims in another action, Sears v. United States, 5:12-CT-3078-BO (E.D.N.C. Apr. 2, 2012). Plaintiff, in his various filings, also talks about his arrest and criminal proceedings. Any claims stemming from these events or relating the North Carolina Department of Public Safety officials also are not part of this action. To the extent plaintiff attempts to raise these claims in this action, such claims are DISMISSED without prejudice.

**CONCLUSION**

For the foregoing reasons, the court GRANTS defendants' respective motions for summary judgment (DE 252, 254). The court DENIES without prejudice the healthcare defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(5) (DE 252). Because the court granted defendants' motions for summary judgment, the court DENIES plaintiff's motions for summary

judgment (DE 262, 272) as moot. The court also DENIES plaintiff's motion for reconsideration

(DE 290). The Clerk of Court is DIRECTED to close this case.

SO ORDERED, this the 26th day of March, 2014.

_____
LOUISE W. FLANAGAN
United States District Judge